# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Mark Filip | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 5216 | **DATE** | 1/3/2005 |
| **CASE TITLE** | HUDGENS vs. WEXLER AND WEXLER | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Defendants' motion for summary judgment is granted with respect to Counts I and II and denied with respect to Count III. Status hearing set for January 13, 2005 at 9:30a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | **Document Number** |
| | No notices required. | |
| | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | JAN 04 2005 |
| ✓ | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |
| TBK | courtroom deputy's initials | date mailed notice |
| | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SHADRACK H. HUDGENS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 00 C 5216 |
| | ) | |
| | ) | Judge Mark Filip |
| WEXLER AND WEXLER, ATTORNEYS, | ) | |
| and NORMAN PAUL WEXLER | ) | |
| | ) | |
| Defendants. | ) | |

DOCKETED
JAN 4 2005

## MEMORANDUM OPINION AND ORDER

Plaintiff Shadrack A. Hudgens ("Plaintiff" or "Hudgens") filed an amended complaint

(D.E. 19[1]) on July 2, 2001, against Defendants Wexler and Wexler, Attorneys, and Norman Paul

Wexler (collectively, "Defendants") alleging, *inter alia*, violations of Title VII of the Civil Rights

Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), for discriminatory discharge based on race

and unlawful retaliation (Counts I and II), and a violation of the Consolidated Omnibus Budget

Reconciliation Act of 1985, 29 U.S.C. § 1161 *et seq.* ("COBRA") and the Employee Retirement

Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"), for failure to notify Plaintiff of his

rights to continue his healthcare coverage (Count III). The case is before the Court on

Defendants' Motion for Summary Judgment ("Motion") on all counts. (D.E. 46.) For the

reasons stated, *infra*, the Motion is granted in part and denied in part.

### BACKGROUND

I.      Local Rule 56.1

Before reciting the factual background of this case, the Court is compelled to comment on

---

[1] The various docket entries are referred to as "D.E. __."



the parties' compliance (and non-compliance) with Northern District of Illinois Local Rule 56.1 ("L.R. 56.1") in this case. L.R. 56.1 requires that statements of facts contain allegations of discrete material facts, and the factual allegations must be supported by admissible record evidence. *See* L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. 581, 583-85 (N.D. Ill. 2000) (Castillo, J.). The Seventh Circuit teaches that a district court has broad discretion to require strict compliance with L.R. 56.1. *See, e.g., Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon*, 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995) (collecting cases)). The Seventh Circuit and district courts have not been wedded to enforcement of the local rule as a matter of mere formalism. Rather, precedent acknowledges that it is a "reasonable judgment" that "consistent, 'bright-line' enforcement is essential"—not only in promoting compliance with the local rule, but even more importantly—"to ensuring that [the] long-run aggregate benefits in efficiency" that L.R. 56.1 is intended to produce are realized for the system of justice in the Northern District. *Koszola*, 385 F.3d at 1109 (collecting cases; citations and internal quotation marks omitted); *accord, e.g., Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995).

In this case, each of the parties variously has violated L.R. 56.1. For example, both parties have made numerous affirmative statements of fact without offering proper evidentiary support, and the Court will not consider those statements. *See, e.g., Malec*, 191 F.R.D. at 583 ("Factual allegations not properly supported by citation to the record are nullities."). Additionally, Defendants improperly filed a Reply to Plaintiff's Answer to Statement of Material Facts Under Rule 56. (*See* D.E. 59 at 1-4.) While Defendants are permitted to file a response to Hudgens's statement of additional facts, *see* L.R. 56.1(a), nowhere does the rule state that a

movant may reply to the responses of the non-movant. Thus, while the Court will consider the latter half of Defendants' Reply, which responds to Hudgens's additional statements of fact, the Court will not consider the unnecessary and improper "replies" to Plaintiff's responses. *See Schulz v. Varian Med. Sys., Inc.*, 315 F. Supp. 2d 923, 925 n.1 (N.D. Ill. 2004) (Castillo, J.); *accord Kozlowski v. Fry*, 238 F. Supp. 2d 996, 1000 n.2 (N.D. Ill. 2002) (Keys, M.J.) (citing *White v. Sundstrand Corp.*, No. 98 C 50070, 2000 WL 713739, at *2 (N.D. Ill. May 23, 2000) (Reinhard, J.), *aff'd*, 256 F.3d 580 (7th Cir. 2001)). Each side also fails to provide foundation for numerous documents that it uses to support its statements and denials. But as neither side objects to these exhibits on an evidentiary basis, and those objections are thus arguably waived, *see* Fed. R. Evid. 103(a), the Court will consider the documents to the extent they are relevant and not plainly inadmissible.

The Court also notes L.R. 56.1's provision that deems admitted for purposes of summary judgment any statement of fact not controverted by the statement of the opposing party. *See* L.R. 56.1(a), (b)(3)(B). Both parties have improperly denied a number of factual assertions by failing to provide adequate or proper record support—sometimes by failing to provide *any* record support at all—for their denials. Thus, where those factual assertions are properly supported by evidence in the record, the Court deems them admitted. *See, e.g., Malec*, 191 F.R.D. at 584 ("[A] general denial is insufficient to rebut a movant's factual allegations."); *id.* (failure to adhere to L.R. 56.1 requirements, including citation to specific evidentiary materials justifying denial, is equivalent to admission). The Court will note such deemed admissions throughout its recitation of the relevant facts below.

3

II.     Facts[2]

Mr. Shadrack H. Hudgens is an African-American male. (Defendants' Statement of Material Facts (D.E. 47) ("Def. SF") ¶ 1 (admitted).) Defendant Wexler & Wexler is a firm operated by a sole proprietor, Norman P. Wexler, which employs over 20 full-time employees, and which in 1999 offered health insurance under a group plan. (Def. SF ¶ 2 (admitted); Plaintiff's Amended Local Rule 56 Statement of Additional Facts in Opposition to Summary Judgment (D.E. 57) ("Pl. SAF") ¶ 2 (admitted).) Hudgens was hired by Wexler & Wexler in 1993 into the position of collector within the collections department. (Pl. SAF ¶ 1 (admitted).) Several days after he was hired, Hudgens was assigned to work as a skip tracer, locating debtors and debtor assets. (Pl. SAF ¶ 3 (admitted).) Within months, Hudgens was performing the duties of a person managing the skip tracing department. (Pl. SAF ¶ 4 (admitted).) Plaintiff was recognized by Wexler & Wexler as a manager of the skip tracing department in 1998. (Pl. SAF ¶ 5 (deemed admitted for lack of support for denial).) Throughout Hudgens's employment, including after he was recognized as a manager, until the last few months of his employment, Hudgens reported to a supervisor, Roy Yarber. (Pl. SAF ¶ 6 (deemed admitted for non-responsive denial); id. ¶ 7 (deemed admitted for lack of support for denial).) Gerald Levy served as the director of operations and had supervisory power over everyone at Wexler & Wexler except for Norman Wexler. (Pl. SAF ¶ 8 (admitted).)

Plaintiff alleges that he was treated less favorably than other persons in a management

_____

[2] The relevant facts are taken from each party's L.R. 56.1 statement of facts and exhibits and corresponding responses. Where the parties disagree over relevant facts, the Court sets forth the competing versions. The Court, as it must, resolves genuine factual ambiguities in Plaintiff's favor. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

position at Wexler & Wexler and also treated less favorably than non-management employees who were Caucasian. In support of this conclusion, Plaintiff points to the fact that he was the only person in the office with managerial responsibilities who was required to punch in and out of the office. (Pl. SAF ¶ 10.) Defendants dispute this by pointing out that Plaintiff admits that he was taken off the clock in March 1997, but they do not dispute that he was required to punch in and out until then. (Defendants' Reply to Plaintiff's Rule 56 Statement of Addition of [sic] Facts in Opposition to Motion for Summary Judgment (D.E. 59) ("Def. Reply") ¶ 10; Pl. SAF ¶ 11.) Hudgens complained about this "unfair" treatment to Yarber, Patti Wexler (who handled time cards), Gerald Levy, and Norman Wexler. (Pl. SAF ¶ 11 (admitted).) Hudgens made complaints several times in 1995, in 1996, and in 1997 about being required to utilize a punch card and about management's failure to recognize him as a manager. (*Id.*)

According to Hudgens, African-American employees in the skip tracing department were treated differently than Caucasian employees.[3] He offers as evidence of this treatment that Norman Wexler and Mitchell Wexler (whose position in the law office is not clear from the summary judgment papers) would regularly greet and address in a friendly manner Patrick Pilewski, a white employee, while ignoring Hasson Garland, an African-American employee who accompanied Pilewski. (Pl. SAF ¶ 12 (deemed admitted for non-responsive denial).) From 1995 to 1998, Hudgens and Yarber, both African Americans, were the only managers who were

---

[3] Hudgens states that Defendants did not want certain employees in the front (and therefore visible to the public) section of the offices because of the color of their skin. (Pl. SAF ¶ 17.) The evidence offered by Hudgens to support this statement, affidavit testimony from a former employee of Wexler & Wexler that no African-American employee was stationed in the front office during the affiant's time of employment, does not support the inference as to the state of mind of Wexler & Wexler management.

not supplied private offices. (Pl. SAF ¶ 14 (deemed admitted for non-responsive denial).) Mara

Salganik, a Caucasian female and manager of accounting, Gerald Levy, a Caucasian male and

director of operations, Marty Bass, a Caucasian male and manager of the clerical department, and

Norman Wexler, a Caucasian male and manager of the legal department, all had private offices.

(*Id.*) In 1998, Hudgens was given a private office.[4] (Pl. SAF ¶ 15.) Yarber sometimes referred

to senior management in ways that reflected his view that they were racist, such as by saying,

"don't trust that white boy," "they are racist," and "they are prejudiced." (Pl. SAF ¶ 16 (deemed

admitted for non-responsive denial).) (Yarber also specifically testified that Wexler & Wexler

never engaged in racially motivated activity (Pl. SAF, Ex. 45 at 50:15-19), never made any hiring

or firing decisions based on racial considerations (*id.* at 50:11-14), and that while he did not

always approve of Defendants' actions, their actions were "[n]ot racially motivated," but were

"[m]oney motivated." (*id.* at 50:20-23; *see also id.* at 50:11-52:21).)

More than ten times from 1995 to 1999, Hudgens complained to Yarber about the

treatment of non-Caucasians, including himself, by management at Wexler & Wexler. (Pl. SAF

¶ 18 (deemed admitted for non-responsive denial).) From at least December 31, 1996, Wexler &

Wexler had in place a harassment policy and grievance procedure in its employee policy manual.[5]

---

[4] Plaintiff states that the office was built for an attorney who failed to become an employee of Wexler & Wexler and that he was instructed by Mitchell Wexler that the office was only temporary. (Pl. SAF ¶ 15.) The record citation given by Hudgens does not support the statement that Hudgens was told the office was only his temporarily. (*See* Pl. SAF, Ex. 44 (Hudgens Dep.) at 63-65.) In contrast, Defendants' denial of Plaintiff's statement is supported by Norman Wexler's testimony that two offices were built: one for the head of skip tracing (Hudgens) and one for an attorney who did not become employed. (Def. Reply ¶ 15; *see* Pl. SAF, Ex. 47 (Wexler Dep.) at 31:3-21.)

[5] Hudgens states that this policy was in effect "during this time." (Pl. SAF ¶ 19.) Apart from the ambiguity of "this time," the exhibit used to support this claim is dated, in its earliest

6

(Pl. SAF ¶ 19 (deemed admitted for non-responsive denial).) In response to Plaintiff's complaints to Yarber, Yarber told Plaintiff "to do his best job and to stay away from the Wexlers." (*Id.* (deemed admitted for non-responsive denial).) Plaintiff also brought his concerns to the attention of Norman Wexler in letters he says he sent in 1996 and 1997.[6] (Pl. SAF ¶ 20.) Defendants deny that Hudgens complained of treatment based on race and offer three letters sent by Hudgens to Wexler in 1997, 1998, and August 1999. (Def. Reply ¶ 20; D.E. 59 (Def. Reply Br.), Ex. K.) None of these letters makes any reference to race or race-based discrimination against Hudgens or any other employee at Wexler & Wexler. Norman Wexler did not discuss the concerns that Hudgens raised in his letters, and at one point, Wexler dismissively referred to one of the letters as a "love letter" while "thumping" the paper on the side of Plaintiff's head. (Pl. SAF ¶ 22 (deemed admitted for non-responsive denial).)

Hudgens was fired by Wexler & Wexler on December 7, 1999. (Def. SF ¶ 8 (admitted in pertinent part).[7]) After Hudgens was terminated, he was replaced by a Caucasian male.[8] (Pl.

---

version, December 31, 1996. (*See* Pl. SF, Ex. 11.)

[6] Hudgens states that he brought his concerns to Wexler in 1996, 1998, and 1999. (Pl. SAF ¶ 20.) Hudgens's deposition testimony cited supports only that Hudgens gave letters to Wexler in 1996 and 1997.

[7] In Defendants' Ex. K, there is a fourth letter from Hudgens to Norman Wexler that post-dates Hudgens's firing. That letter, which is one and one-half pages in length, addresses several subjects, most of which do not refer to any possibility of racism. In the penultimate paragraph of the letter, however, Hudgens prays that "the truth to this mater [sic] be revealed to you [Wexler] my [sic] the Lord Almighty," and also prays "that the nasty word or idea of discrimination has not played a role in this matter . . . ." (*Id.*) As stated, this letter was not sent during the period of Hudgens's employment.

[8] Hudgens states that "[o]nly after Plaintiff's immediate replacement quit, and after Wexler & Wexler received notice of Plaintiff's charge of discrimination with the EEOC, did Wexler & Wexler hire a non-Caucasian female to manage the skip tracing department." (Pl. SAF

SAF ¶ 23 (deemed admitted for non-responsive denial and lack of support for denial).)

Defendants state that Hudgens was fired for insubordination. Notes prepared by Levy state the following reasons that he terminated Plaintiff: "(1) Major lack of performance and drop in production, (2) Conflicts regarding his performance of my instruction and actual implementation [(A)] reporting; [(B)] termination of non producers; (3) poisoning the atmosphere in the skip tracing department and lowering morale; (4) taking time off without advance notice and also disappearing for long periods of time during the day." (Def. SF ¶ 13 (deemed admitted for lack of support for denial).) Defendants offer payroll records that show that Hudgens's production (as measured by the amount of commission he earned) dropped $17,321 over two years. (Def. SF ¶ 14.) Plaintiff disputes that these payroll records are evidence of his lowered production. He claims that his commissions were based on the number of "hits" (not defined) that he and his department turned in, and that his decreased hits can be explained by other factors, such as his increased responsibility in non-hit-based work and the company's focus on different types of hits (which are apparently worth different commissions). (Plaintiff's Responses to Defendant's Background (D.E. 57) ("Pl. Resp.") ¶ 14.)

The event that apparently precipitated Hudgens's termination was an act of alleged insubordination on his part. In December 1999, Levy instructed Hudgens to lay off the four "lowest producers" for that month in the skip tracing department. (Def. SF ¶ 15 (admitted in pertinent part).) Although the briefing is not explicit about which employees were laid off, the

---

¶ 24.) The record citations provided by Plaintiff do not support the notion of the timing of the hiring of a person named "Carmen" who apparently became the skip tracing manager. (*See* Pl. SAF, Ex. 45 (Yarber Dep.) at 11; *id.* Ex. 47 (improperly cited as Ex. 50) (Wexler Dep.) at 25-26.)

Court adduces that Angelica Calderon, William Campbell, Latrena Harthrone, and Fundador Quinones were laid off by Hudgens. (*See* Def. SF ¶ 15; *id.*, Ex. F.) Wexler & Wexler offers what it calls "production sheets" (which appear to be payroll records that reflect commissions paid to each employee) for the pay period ending November 17, 1999, to support its claim that Hudgens disregarded Levy's instruction and laid off at least some high producers and not the four lowest ones. (Def. SF, Ex. F.) According to Defendants, had Hudgens followed the instructions that Hudgens said Levy gave him,[9] he would have laid off Maricela Aguilar, William Campbell, Hasson Garland, and Sarah Melendez. (Def. SF ¶ 15.) Plaintiff denies these facts by stating that Plaintiff relied on other "skip tracing reports he maintained" to determine skip tracer activity and that he then laid off the four lowest producers for that month.[10] (Pl. Resp. ¶ 15.)

---

[9] Hudgens says that Levy instructed him in December 1999 to lay off the four lowest producers in the month prior to the layoff (Pl. Resp. ¶ 15); Defendants contend that Levy did not direct Hudgens to lay off the four lowest producers for only the prior month and instead intended Hudgens to lay off the four lowest producers for 1999 as a whole (*see, e.g.*, Def. SF 15). Although Hudgens's position is arguably implausible, the Court accepts his version of the directions. As explained further below, however, even under Hudgens's view of his directions, Defendants are entitled to partial summary judgment, *i.e.*, on Counts I and II.

[10] Plaintiff provides the Court with what are apparently the records he relied upon in deciding whom to lay off, but those records are incomprehensible and Plaintiff makes no attempt to explain them or present them in intelligible form. (*See* Pl. SAF, Ex. 13.) Each "record" is labeled based on a particular "tracer number" (which, one might guess, presumably corresponds to a particular employee), but there is no identifying information to tie the records to Plaintiff's claims that he actually fired the lowest producers. (Pl. SAF ¶ 15.) Plaintiff also attaches affidavits from Angelica Calderon (Pl. SAF, Ex. 20), Hasson Garland (Pl. SAF, Ex. 21), and William Campbell (Pl. SAF, Ex. 22). As Plaintiff frames his argument (Pl. SAF ¶ 15), he appears to offer these affidavits for a purpose clearly prohibited by the hearsay rules—*i.e.*, to show that Levy told Hudgens to fire the lowest producers for the prior month (as opposed to the year), because the affiants heard Hudgens (and not Levy) say that Levy had so stated. The Court notes, *sua sponte*, however, that each of the identical affidavits states that, at the December 1999 meeting Hudgens called concerning the lay offs, "Hudgens produced the production sheets from the last month and showed the group that the lowest producers were [the persons he laid off]." (Pl. SAF, Ex. 20-22.) Reading this evidence generously in favor of Plaintiff, it provides at least

After Hudgens was terminated, Wexler & Wexler paid the premium for his health benefits in January 2000. (Def. SF ¶ 23 (deemed admitted for lack of support for denial).) There is a dispute over whether Wexler & Wexler sent Plaintiff a notice of termination of his health insurance. Defendants claim that Plaintiff sent Hudgens a notification letter on December 9, 1999. (Def. SF ¶ 22; D.E. 46 (Def. Motion), Ex. ¶ 12.) Plaintiff denies that he received any letter from Defendants regarding his health benefits. (Pl. SAF ¶ 26.) The address to which Defendants allegedly mailed the letter was a post office box in Chicago. (D.E. 46 (Def. Motion), Ex. ¶ 12.) Plaintiff claims that the contact address listed on his employee information form and employment application with Wexler & Wexler is a street address on West 54th Place in Chicago, which was the address at which Plaintiff received all written communication from Defendants during his employment. (Pl. SAF ¶ 35.) Plaintiff also claims that on January 11, 2000, Plaintiff sent a letter to Wexler & Wexler requesting that his contact information be changed to his post office box address. (*Id.*) Defendants assert that they did have Plaintiff's post office box address, as evidenced by a W-4 IRS form (withholding allowance certificate) signed by Plaintiff, dated April 3, 1999, which listed post office box. (Def. Reply ¶ 35.)

Plaintiff first learned that his health insurance had been terminated after discovering that he was unable to get psychiatric care for lack of coverage in January or February 2000. (Pl. SAF

some intelligible evidence (in contrast to Pl. SAF, Ex. 13) that Plaintiff had some basis for believing that he laid off the lowest producers for November 1999. As explained further below, however, Defendants have adduced sufficient evidence showing that they too reasonably believed that Plaintiff did not lay off the lowest producers, even for the single month before the lay off, and precedent does not require Defendants to show that their employment decision was correct on the merits, but merely that it was not a lie employed as a pretext for racial discrimination. *See, e.g., Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered.") (internal quotation marks and citation omitted).

¶ 29 (deemed admitted for non-responsive denial).) Plaintiff contacted Defendants' insurance carrier about January 2000 and was instructed that he should contact Defendants regarding his right to COBRA (presumably referring to his right under COBRA to extend his health insurance by paying the premium himself). (Pl. SAF ¶ 30 (deemed admitted for non-responsive denial).) Hudgens then called Mara Salganik at Wexler & Wexler who told Hudgens that Defendants do not participate in COBRA. (Pl. SAF ¶ 30, 33.) Defendants deny this by offering testimony by Salganik that she terminated Plaintiff's coverage because Plaintiff called her, asked for a return of his share of the premium of January, and, when asked, told Salganik that he did not wish to continue his health coverage. (Def. Resp. ¶ 33.) Plaintiff does not dispute that Hudgens called the office in January and asked for a refund of his share of the January premium. (Def. SF ¶ 24 (admitted).) Defendants' insurance carrier terminated Plaintiff's coverage effective upon the date of his termination, December 7, 1999. (Pl. SAF ¶ 31 (deemed admitted for lack of support for denial).)

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

11

250 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## DISCUSSION

III.  Discriminatory Discharge

Unfortunately, Hudgens's Title VII case as presented on summary judgment is "another case" in which, as the Seventh Circuit recently lamented, a litigant has "simply collected the sum total of all the unpleasant events in [his] work history since [1993], dumped them into the legal mixing bowl of this lawsuit, set the Title VII-blender to puree and poured the resulting blob on the court." *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 782 (7th Cir. 2004) (internal quotation and citation omitted). Although Hudgens complains of numerous ways that he was mistreated, he does not explain with any degree of precision how those acts translate into liability on the part of Wexler & Wexler, if at all. As best the Court can tell from his summary judgment response, Plaintiff ultimately puts forward two theories of liability related to his termination, one based on race and another for retaliation. (*See* D.E. 56 at 3, 12, 16-17.) In his discussion of his wrongful discharge claims, Hudgens does not separate out or specify which things that Wexler & Wexler allegedly did to him support a claim for race-based discrimination and which support a claim for retaliation. It is clear, however, that Hudgens does not make a claim that he was subjected to a racially hostile work environment. Plaintiff also explicitly concedes that he has no evidence to support a claim for failure to promote him. (D.E. 56 at 3.) As a result, to the extent the amended complaint presents a claim for failure-to-promote, it is dismissed.

12

Even more frustrating for the Court, Plaintiff has failed to provide any relevant law with which to address his various and diverse statements regarding his allegedly wrongful termination. In almost ten pages of argument on his allegedly unlawful discharge, Hudgens (who is represented) does not cite a single case in support of his cause, much less explain the legal relevance under applicable precedent of his roaming allegations and arguments.

"This court has no duty to research and construct legal arguments available to a party, especially when he is represented by counsel." *Tyler v. Runyon*, 70 F.3d 458, 466 (7th Cir. 1995) (internal quotation omitted); *accord, e.g., LINC Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 921-22 (7th Cir. 1997) (collecting cases). Moreover, at least for a represented party, the Court "is not equipped to act as auxiliary lawyer for a party," and "[t]he responsibility for the identification, framing, and argument of the issues . . . is that of the lawyers, not of the judges." *Tyler*, 70 F.3d at 466; *see also, e.g., Luddington v. Ind. Bell Tel. Co.*, 966 F.2d 225, 230 (7th Cir. 1992) ("If we assume the lawyers' responsibilities, we unbalance the market for legal services and take time away from our consideration and decision of other cases."). Rather than use its discretion to deem the entirety of Plaintiff's Title VII arguments waived as a matter of course—*see, e.g., LINC Finance Corp.*, 129 F.3d at 921 ("[T]he failure to cite authorities in support of a particular argument constitutes a waiver of the issue" (collecting cases)); *Luddington*, 966 F.2d at 230 (collecting cases)—however, the Court will consider Plaintiff's arguments to the extent the Court is able to discern them.

On another general note, throughout their Motion, Defendants argue that Hudgens should not be able to rely on past actions that he alleges are discriminatory because they are time barred under *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). *See* 42 U.S.C. §

13

2000e-5(c) and (e) (employee must file a charge of discrimination within 180 or 300 days of unlawful employment practice, depending on whether state proceedings may be and have been commenced). The only discrete act of which Plaintiff complains at this point in the lawsuit is his termination, which Defendants do not dispute fell within the 300-day statutory period. *National Railroad* stands for the proposition that "discrete discriminatory acts are not actionable if time barred, even if they are related to acts alleged in timely filed charges." 535 U.S. at 113. This rule does not, however, "bar an employee from using the prior acts as background evidence in support of a timely claim." *Id.* Plaintiff does not address this issue at all. The Court will look to the earlier allegedly discriminatory actions, to the extent they appear relevant, as evidence to support Plaintiff's claims of wrongful termination based on race and retaliation.

With those thoughts in mind, the Court now turns to Hudgens's claim for wrongful discharge.

A.    Discharge Based on Race

In order for Hudgens to prevail on a claim of racial discrimination, he must present direct evidence of discriminatory intent or proceed under the *McDonnell Douglas* burden-shifting framework. *See, e.g., Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1107 (7th Cir. 2004). As best the Court can tell from Plaintiff's summary judgment papers, Plaintiff is not presenting a case under the direct method of proof. If he were, however, the Court finds no evidence that would support such a claim. Hudgens has not put forth, for example, an "admission by the decision-maker that his actions were based on the prohibited animus," which would constitute direct evidence of discriminatory intent. *Id.* at 1109 (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir.2000)); *see also Cerutti v. BASF Corp.*, 349

F.3d 1055, 1060 (7th Cir. 2003) ("Direct evidence 'essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus.'") (quoting *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003)); *Castleman v. Acme Boot Co.*, 959 F.2d 1417, 1420 (7th Cir. 1992) (acknowledging that direct evidence will "rarely" be found).

Plaintiff may also prevail under the direct method if he presents "a 'convincing mosaic' of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Koszola*, 385 F.3d at 1109 (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)). "'That circumstantial evidence, however, must point directly to a discriminatory reason for the employer's action'" at issue. *Koszola*, 385 F.3d at 1109 (quoting *Rhodes.*, 359 F.3d at 504). If the Court takes all the actions by Wexler & Wexler that Plaintiff has alleged are discriminatory, *e.g.*, waiting until 1998 to offer Hudgens a private office while Caucasian managers had private officers earlier, and making Hudgens punch in and out while Caucasian managers did not have to do so, Plaintiff has not created a "convincing mosaic" that establishes a triable issue as to discriminatory intent for his termination. (The Court notes that Hudgens does not assert that he had more seniority than other managers with private offices; nor does Hudgens discuss their relative responsibilities at the firm or assert that he had more responsibilities than any of the others. These considerations surely matter (both here and for purposes of any comparators-analysis): for example, one of the Caucasian managers with private offices of whom Hudgens complains was Norman Wexler, the principal of the entire firm. (D.E. 57 at 10, ¶ 14.)) Hudgens's assertion that Norman Wexler regularly greeted Patrick Pilewski (a Caucasian employee) warmly and ignored Hassan Garland (an African-American employee), does not help to forestall summary judgment concerning Hudgens's termination, particularly

given that it is undisputed that Norman Wexler personally talked to Hudgens and persuaded him not to resign in the summer of 1999 when Hudgens indicated that he might leave the firm. (Pl. SAF, Ex. 44 (Hudgens Dep.) at 93:19-95:4.) In sum, the remaining circumstantial evidence does not "point directly to a discriminatory reason for the employer's action" at issue, *i.e.*, Hudgens's termination. *Koszola*, 385 at 1109 (internal quotation omitted); *see also id.* at 1111 ("As we have often stated, summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. . . . [Plaintiff's] evidence falls . . . short.") (collecting cases; internal quotes and citations omitted). Thus, the Court must determine whether Hudgens has made out a *prima facie* case of race discrimination under the indirect, burden-shifting approach.

To survive summary judgment under the burden-shifting paradigm set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), Hudgens must establish the following elements: "(1) he was a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) other similarly situated employees who were not members of his protected class were treated more favorably." *Davis*, 368 F.3d at 784. If Hudgens makes these showings, the burden of production shifts to Wexler & Wexler to provide a "legitimate, nondiscriminatory reason for terminating him." *Id.* (citing *Cerutti*, 349 F.3d at 1061). Hudgens must then rebut Defendants' proffered basis for his termination "with evidence that it is just a pretext for race discrimination." *Davis*, 368 F.3d at 784. "Despite these shifting burdens of production, the ultimate burden of persuasion always remains with the plaintiff." *Essex v. United Parcel Serv., Inc.*, 111 F.3d 1304, 1309 (7th Cir. 1997).

Plaintiff cannot prevail under this method, as Defendant contends. First, Plaintiff has not identified other similarly situated comparators of other races who were treated differently, as he must. In this regard, Hudgens has failed to demonstrate, as precedent instructs, "that there is someone who is directly comparable to him in all material aspects" who was treated differently concerning the disputed employment issue. *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 300 (7th Cir. 2004) (quoting *Grayson v. O'Neill*, 308 F.3d 808, 819 (7th Cir. 2002) (collecting cases)).[11] This defect is fatal, and summary judgment is therefore appropriate on Count I.

In addition, Plaintiff cannot meet his burden concerning pretext. Defendants offer four reasons that Plaintiff was terminated: (1) lack of performance and drop in production; (2) conflicts regarding performance of Levy's instruction and actual implementation, including termination of non producers; (3) poisoning the atmosphere in the skip tracing department and lowering morale; and (4) taking time off without advance notice and disappearing for long periods of time during the day. (Def. SF ¶ 13.) Plaintiff does not offer properly supported evidence to create a triable issue concerning whether Defendants' articulated reasons for firing Hudgens are pretextual. *See, e.g.*, *Davis*, 368 F.3d at 784 ("[A] pretext for discrimination . . .

---

[11] To the extent Hudgens discusses treatment of other managers at all (and he does not do so a great deal, much less in the framework of the Title VII comparators-analysis specified by precedent), one incident he describes substantially undermines Hudgens's position. Specifically, Hudgens states that "[i]f Defendant were truly and legitimately concerned with a poisoning of the atmosphere in the company and a lowering of morale, then other Defendant employees proved much more legitimate targets. Yarber [another African-American manager] wore a gas mask in the office when there was an issue regarding an employee's personal hygiene. Yarber did not face the degree of unfavorable treatment that plaintiff faced. A critical difference between Yarber and Plaintiff is that the prior came to the company with clients and maintained clients for the Defendant." (D.E. 56 (Pl. Resp. Br.) at 10.) This passage does not support Plaintiff's cause. The passage suggests that the Defendant law firm—like many law firms and other institutions, for better or worse—gave more leeway to individuals who brought money into the institution, not that the institution is one motivated by racism.

means something worse than a business error; pretext means deceit to cover one's tracks." (internal quotations and citations omitted)); *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000) ("[Pretext] means a dishonest explanation, a lie rather than an oddity or an error.").

First, Hudgens claims that Wexler & Wexler did not provide him with an explanation for why he was terminated at the time he was fired. This claim does nothing to indicate that the articulated reasons are lies or otherwise pretextual. Hudgens also claims that he did not exhibit a major lack of performance or a drop in production. To support this, however, he asserts without support that "production in skip tracing ebbed and flowed as a matter of course." (D.E. 56 (Pl. Resp. Br.) at 10.) He then points to the fact that when his production dropped (based on Defendants' own measure) in other years, he was not terminated. Plaintiff also states that he and his department were "confronted with major changes imposed without consultation that affected production in the last quarter of 1999." (D.E. 56 at 11.) Even if these characterizations of Plaintiff's performance are true, they do not prove pretext. Precedent instructs that this Court does "not sit as a superpersonnel department" that reexamines an entity's business decision and reviews the propriety of the decision. *Davis*, 368 F.3d at 785 (citation omitted). "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Id.* at 784 (internal quotation and citation omitted). Hudgens's proffered evidence does not prove that Defendants' articulated reasons were dishonest. Plaintiff also offers a characterization of the lay offs that precipitated his termination that would indicate that he had, indeed, followed Levy's instructions. (D.E. 56 at 11.) But, at most, Plaintiff and Defendants have shown (with Defendants presenting the far more coherent and compelling

account) that the two sides may have had access to different sets of commission records (Defendants Exhibits F & I, on the one hand, and Plaintiff's largely unintelligible Exhibit 13, on the other), by which people could come to different conclusions about who were the lowest producers in the month before the lay off. But precedent repeatedly has taught that arguing about who was right in such a situation is "a distraction"—*Green v. Nat'l Steel Corp.*, 197 F.3d 894, 900 (7th Cir. 1999); *Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997)—because even if Defendants were wrong, that is not actionable under Title VII unless they were acting for racial reasons. Hudgens has not created a triable issue on that score; indeed, one could fairly question whether he has even created a triable issue about whether he fired the lowest producers based on his own view of the records. (*See generally* D.E. 46 (Def. Motion), Ex. 10 (post-termination letter from Hudgens to Norman Wexler) at 1-2 (suggesting that, when Hudgens went to fire the four lowest producing employees, he presided over meeting where higher producing employees quit and lower producers were allowed to stay).) In any event, however, the salient point is that Hudgens has failed to demonstrate that there is a triable issue about whether Defendants are lying and instead have acted for racial reasons.

In sum, Plaintiff has failed to create a triable issue regarding pretext—as to whether the reasons offered by Wexler & Wexler for terminating his employment were not based in fact, or whether they did not honestly motivate Wexler & Wexler to discharge Hudgens.[12] Thus, Plaintiff

---

[12] Plaintiff offers other reasons in his response brief that are not supported by a properly supported statement of fact in his L.R. 56.1 response or affirmative statement, so these reasons will not be considered by the Court. For example, Plaintiff claims in that he obtained his employee file from Wexler & Wexler in August 2000 with the assistance of the Illinois Department of Labor and that the file did not contain the Levy's notes that supposedly were drafted in December 1999 (which is presumably meant to infer that Levy made up these notes as part of this litigation). (*See, e.g.*, D.E. 56 at 9 (citing Pl. Resp. ¶ 13).) Plaintiff offers no

has failed to establish an essential element of his case, *i.e.*, that the legitimate, non-discriminatory basis Defendants offered for his termination was a pretext for race discrimination, and summary judgment is proper Count I.

### B. Retaliatory Discharge

A plaintiff may establish a *prima facie* case of retaliation through either the direct or indirect method of proof. "Under the direct method, the plaintiff must present direct evidence of (1) a statutorily protected activity; (2) an adverse action taken by the employer; and (3) a causal connection between the two." *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2003). "Under the indirect method, the plaintiff must show that (1) [he] engaged in a statutorily protected activity; (2) [he] performed [his] job according to [his] employer's legitimate expectations; (3) despite [his] satisfactory job performance, [he] suffered an adverse action from the employer; and (4) [he] was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Id.* If the plaintiff establishes these elements, the burden shifts to the defendant to come forward with a legitimate, non-invidious reason for the adverse action. *Id.* "Although the burden of production shifts to the defendant under this method, the burden of persuasion rests at all times on the plaintiff." *Id.* (internal quotation omitted). "Once the defendant presents a legitimate, non-invidious reason for the adverse action, the burden shifts back to the plaintiff to show that the defendant's reason is pretextual." *Id.*

Defendants' argument in regard to Plaintiff's retaliation claim is not a pinnacle of precision, but Defendants appear to argue that Plaintiff has not established a *prima facie* case of

---

evidence (*see* Pl. Resp. ¶ 13) that he obtained that file, what was in the file, or what should have been in the file.

retaliation. In particular, Defendants argue that Plaintiff has provided no support for his allegation that he was retaliated against for complaining about not being promoted.[13] Defendants also argue that Plaintiff did not allege retaliation in his EEOC charge.

Unlike Plaintiff's race discrimination claim, discussed above, the Court cannot overlook Plaintiff's utter failure to properly brief his retaliation claim, and the Court will not attempt to construct an argument for him. Hudgens makes no response to Defendants' legal arguments regarding Hudgens's retaliation claim. Indeed, in his Memorandum of Law supporting his response to the Motion, Plaintiff only mentions retaliation in three places: once to summarize his Amended Complaint (D.E. 56 at 2); once in a heading titled "Wrongful Discharge & Retaliatory Discharge" (*id.* at 3); and in his conclusion, again generally summarizing his claims (*id.* at 16-17). The Supreme Court teaches that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses," *Celotex*, 477 U.S. at 323-24, and Plaintiff's failure to support his claim of retaliation with either facts or legal argument leads the Court to find that summary judgment is proper on Count II. *See generally LINC Fin. Corp.*, 129 F.3d at 922 ("[Party's] utter failure to produce a single case or statute supporting his non-jurisdictional arguments, therefore, is sufficient to waive all of those arguments."); *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues)."); *Luddington*, 966 F.2d at 230 ("If we assume the lawyers' responsibilities, we

---

[13] Plaintiff's Amended Complaint alleges that on August 6, 1999, he complained to Wexler & Wexler about not being promoted and threatened to resign, and that he was terminated because of that complaint. (D.E. 19, Count II ¶¶ 4, 6.)

unbalance the market for legal services and take time away from our consideration and decision of other cases. So, if an appellant fails to make a minimally complete and comprehensible argument for each of his claims, he loses regardless of the merits of those claims as they might have appeared on a fuller presentation.") (collecting cases).

"To avoid any appearance that [the Court is] 'sacrificing substantive justice on the altar of administrative convenience,'" however, the Court will briefly address the substantive issues of Plaintiff's retaliation claim, as best the Court can divine them. *LINC Fin. Corp.*, 129 F.3d at 922 (quoting *Luddington*, 966 F.2d at 230) (alteration omitted). Plaintiff never states in his response to the Motion that he complained to Wexler & Wexler of not being promoted on August 6, 1999 (the basis of his allegation of retaliation). Plaintiff does state that he "wrote his concerns in the form of a letter to company president Norman Wexler explicitly referencing a lack of trust and appreciation"[14] (Pl. SAF ¶ 20), but this letter does not complain of either his failure to be promoted or any type of race-based discrimination (see D.E. 59, Ex. K).

In Plaintiff's statement of additional facts, he states in vague terms that he complained to Yarber more than ten times "about the treatment of non-Caucasians, especially himself and other African American employees by senior management." (Pl. SAF ¶ 18.) Plaintiff also states that he complained to various people at Wexler & Wexler about being required to utilize a punch card and Defendants' failure to recognize Plaintiff as a manager when he considered himself one. (Pl. SAF ¶ 11.) Nowhere, however, does Plaintiff provide any argument or legal authority that would establish that his complaints amounted to statutorily protected activity. Even if the Court were to conclude that any or all of these complaints are statutorily protected activity (which point the

_____

[14] The letter actually states "appreciation and respect." (Pl. SAF, Ex. 17.)

Court does not reach), Plaintiff does not provide any evidence that would establish a causal connection between those complaints and his termination. Indeed, Plaintiff's entire argument in his brief is directed toward his race discrimination claim.[15]

Even if Plaintiff were attempting to proceed under the indirect method of proof (which he has not informed the Court that he is), the Court finds that Plaintiff has failed to produce any evidence (much less point to sufficient evidence to create a triable issue) that he was treated differently than similarly situated persons who did not engage in statutorily protected activity. Hudgens has failed to identify any similarly situated persons for the Court. Additionally, Plaintiff makes no separate arguments regarding pretext in the context of retaliation other than those made in the context of race discrimination, and the Court therefore finds that, as described *supra*, Plaintiff has failed to demonstrate that Defendants' articulated reasons are pretextual. Because Plaintiff has failed to make a sufficient showing on these multiple essential elements of his case with respect to which he has the burden of proof, summary judgment is proper on Count II.

Alternately, the Court finds that Plaintiff's claim of retaliatory discharge is beyond the scope of his EEOC charge. Generally speaking, a plaintiff cannot bring claims in a lawsuit that were not included in his EEOC charge. *Cheek v. W. and S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994) (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974)). "Although the rule is not jurisdictional, it is a condition precedent with which Title VII plaintiffs must comply."

---

[15] Hudgens concludes the argument section apparently meant to address both race discrimination and retaliation by stating: "The reasons given by Defendant for terminating Plaintiff's employment are simply untrue and are after-the-fact pretextual justifications designed to cover up another reason: that Defendants' Caucasian male leadership would not accept and treat Plaintiff as equal to Caucasian managers." (D.E. 56 at 12.)

*Cheek*, 31 F.3d at 500 (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 392 (1982); *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 864 (7th Cir.1985)) (internal citations omitted). Understanding that most EEOC charges are filled out by laypersons rather than attorneys, the Seventh Circuit teaches that "a Title VII plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in [his] complaint." *Id.* Therefore, all Title VII claims set forth in a complaint are cognizable that are "like or reasonably related to the allegations of the [EEOC] charge and growing out of such allegations." *Id.* (internal quotations omitted). Hudgens meets this test if "there is a reasonable relationship between the allegations in the charge and the claims in the complaint, and the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Id.*

Hudgens has failed to meet the first part of this test. "When an EEOC charge alleges a particular theory of discrimination, allegations of a different type of discrimination in a subsequent complaint are not reasonably related to them unless the allegations in the complaint can be reasonably inferred from the facts alleged in the charge." *Cheek*, 31 F.3d at 503. Although Plaintiff plainly alleges race discrimination in his EEOC charge, a claim of retaliation cannot reasonably be inferred from the facts alleged. *See generally Sitar*, 344 F.3d 726-27 (sex discrimination claim not reasonably related to retaliation claim). In his Charge of Discrimination filed with the EEOC, Plaintiff checked the box marked "Race" under the heading "Cause of Discrimination Based On," and he left the box marked "Retaliation" blank. (*See* D.E. 19, Ex. B.) In his narrative description of the particulars of his charge, Plaintiff describes his discharge by Defendants and attributes it to his race. (*See id.*) Nowhere does he make mention of his complaints to the managers at Wexler & Wexler (even if they were protected activity). (*See id.*)

Simply, his description of his alleged wrongful termination did not afford the EEOC and Defendants an opportunity to settle any dispute based on retaliation, nor did it give Wexler & Wexler some warning of the retaliatory conduct about which the Hudgens claims he suffered. *See Cheek*, 31 F.3d at 500. Thus, for the independent and alternate reason that Plaintiff failed to include his claim of retaliatory discharge in his EEOC complaint, Defendants are entitled to summary judgment on Count II.

IV.     COBRA

Plaintiff alleges that after his termination, Defendants did not notify him of his right to continue his healthcare coverage (D.E. 19, Count III ¶ 6), and that he incurred substantial expenses for healthcare because he was not covered by insurance (*id.*, Count III ¶ 9; *see* Pl. SAF, Ex. 43 (medical bills)). COBRA requires an employer who is a plan administrator to notify any "qualified beneficiary" of his right to continued healthcare coverage in the event of a "qualifying event." 29 U.S.C. §§ 1161, 1163(2), 1164(a)(4); *accord Mlsna v. Unitel Communications, Inc.*, 41 F.3d 1124, 1127-28 (7th Cir. 1994). An employee who does not receive the required notice may bring a civil action against the plan administrator, which may be liable "in the amount of up to $100 a day from the date of such failure [to notify] . . . and the court may in its discretion order such other relief as it deems proper." 29 U.S.C. § 1132(c)(1).

Here, Defendants do not dispute either that Plaintiff was covered under a health plan that they administered or that Plaintiff's termination constituted a "qualifying event." Rather, Defendants argue that summary judgment is proper because they satisfied their duty under COBRA to notify Plaintiff of his right to continued healthcare coverage. In particular, Defendants point to evidence that they mailed a notice letter to Plaintiff on December 9, 1999,

and argue that this letter is proof of its notice to him. (Def. SF ¶¶ 22-23.) Defendants argue that this evidence entitles them to a presumption that the notice was received. Plaintiff, on the other hand, denies that he ever received this letter.[16] (Pl. SAF ¶ 26.) Thus, Plaintiff has established a genuine issue of material fact as to whether Plaintiff was notified of his right to continuation of coverage, and summary judgment is not proper on Count III.[17]

---

[16] Plaintiff also argues that even if he had received the letter, it provided him insufficient notice of his rights under COBRA. Because the Court finds that there is a genuine issue of material fact as to whether Plaintiff received the notice at all, the Court need not decide this issue.

[17] Defendants suggest that Plaintiff cannot prevail because he cannot show that Defendants did not make a good faith attempt to comply with the notification demands of COBRA. *See* D.E. 59 (Def. Reply Br.) at 12 (quoting *Lawrence v. Jackson Mack Sales, Inc.*, 837 F. Supp. 771, 782 (S.D. Miss. 1992) (stating that COBRA does not specifically prescribe required method of providing notice)). In this regard, although the Seventh Circuit has not addressed this issue, courts in this and other districts have held that "'a good faith attempt to comply with a reasonable interpretation of the statute is sufficient' to satisfy COBRA requirements," and have held that, accordingly, an employer need not prove actual receipt of the COBRA notice by the employee. *Keegan v. Bloomingdale's, Inc.*, 992 F. Supp. 974, 977 (N.D. Ill. 1998) (Denlow, M.J.) (quoting *Smith v. Rogers Galvanizing Co.*, 128 F.3d 1380, 1383 (10th Cir.1997) (collecting cases)); *accord Degruise v. Sprint Corp.*, 279 F.3d 333, 336 (5th Cir. 2002); *Powell v. Paterno Imports, Ltd.*, No. 03 C 8175, 2004 WL 2434225, at *8 (N.D. Ill. Oct. 28, 2004) (Coar, J.). This issue is presented in meaningful form only in Defendants' Reply Brief, so it will not be considered here.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is granted with respect to Counts I and II and denied with respect to Count III.

So ordered.

_____
Mark Filip
United States District Judge
Northern District of Illinois

Date: January 3, 2005